*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEPERRYON DEANTHONYDESEAN KING,

        Defendant-Appellant.

UNPUBLISHED
August 11, 2026
10:25 AM

No. 371096
Saginaw Circuit Court
LC No. 22-050186-FC

Before: BOONSTRA, P.J., and YOUNG and KOROBKIN, JJ.

PER CURIAM.

Defendant, Deperryon Deanthonydesean King, appeals by right his jury-trial convictions of first-degree murder, MCL 750.316(1), being a felon in possession of a firearm, MCL 750.224f(6), being a felon in possession of ammunition, MCL 750.224f(7), carrying a dangerous weapon with unlawful intent, MCL 750.226, and four counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On June 19, 2022, Monte Wilson attended a Father's Day neighborhood block party with his family, including his wife, Ashanti Wilson, and his daughters, TW and MW. At the party, Monte was intoxicated and argued with a group of other attendees. Eyewitnesses gave inconsistent testimony regarding whether defendant was initially part of this argument. The argument escalated, and one of the attendees, Cortez Owens,[1] told MW that her father had said that he would kill them. TW testified that she saw one of the attendees draw a handgun and begin "taunting" Monte with it. TW attempted to pull Monte back to their house, but he refused. She testified that Monte "pulled out a gun and there were shots fired." According to TW, Monte returned fire. But Ashanti testified that she did not know if Monte returned fire, and MW testified that she never saw Monte with a gun. After an initial round of fire, Monte attempted to return to his house. But he

---

[1] Owens was unavailable to testify because he died before defendant's trial.

was shot in the arm after a second round of fire. The bullet went through his arm and into his chest cavity. He died from the injury.

Investigating officers found photographs on defendant's phone of defendant at the block party aiming a firearm. They also found several searches related to the shooting. At trial, the defense did not offer any evidence or call any witnesses, instead arguing that the prosecution's evidence was insufficient or that, if defendant did shoot Monte, it was done in self-defense. Defendant was convicted as described earlier, and this appeal followed. This Court granted defendant's motion to remand to the trial court for an evidentiary hearing regarding whether his defense counsel was ineffective for failing to investigate and call Deshawn Reed-Davenport and Emilio Zamora, both of whom were present during the shooting, as defense witnesses.[2] After a hearing, the trial court held that defense counsel was not ineffective and denied defendant's motion for a new trial. We now review that decision along with defendant's other claims.

## II. INEFFECTIVE ASSISTANCE

Defendant argues that he was denied the effective assistance of counsel when his defense counsel failed to investigate and call witnesses who allegedly would have provided exculpatory testimony, when he conceded defendant's guilt during his closing argument, and when he failed to object to a forensic pathologist's testimony about Wilson's cause of death. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

"Generally, whether a defendant had the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012) (quotation marks and citation omitted). "This Court reviews findings of fact for clear error and questions of law de novo." *Id*. To preserve a claim of ineffective assistance of counsel, the defendant must move in the trial court for a new trial or an evidentiary hearing or move in this Court for a remand for an evidentiary hearing. *Id*.; *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Defendant preserved this issue by moving in this Court for a remand, but we granted the motion only with respect to his claim that defense counsel was ineffective for failing to investigate or call witnesses with allegedly exculpatory testimony. Therefore, we consider the results of the trial court's *Ginther*[3] hearing for that claim, but we review the other claims for "errors apparent on the record." *Abcumby-Blair*, 335 Mich App at 227. We review the trial court's decision to deny defendant's motion for a new trial for an abuse of discretion. See *People v Russell*, 297 Mich App 707, 715; 825 NW2d 623 (2012).

### B. FAILURE TO INVESTIGATE AND CALL WITNESSES

The United States Constitution and the Michigan Constitution both entitle a criminal defendant to the assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. Counsel must be effective to satisfy this constitutional requirement. *Strickland v Washington*, 466 US 668, 686;

---

[2] *People v King*, unpublished order of the Court of Appeals, entered November 21, 2025 (Docket No. 371096).

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-2-

104 S Ct 2052; 80 L Ed 2d 674 (1984).  Counsel is ineffective if "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that [the] outcome would have been different." *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023) (quotation marks and citation omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).  The burden is on the defendant to establish the factual predicate for an ineffective-assistance claim.  *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014).

"There is a presumption that counsel was effective, and a defendant must overcome the strong presumption that counsel's challenged actions were sound trial strategy." *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015).  "This Court will not substitute [its] judgment for that of counsel on matters of trial strategy, nor will [this Court] use the benefit of hindsight when assessing counsel's competence."  *Id*. (quotation marks and citation omitted; alterations in original).  "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy."  *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).  However, "[c]ounsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012) (quotation marks and citation omitted).

Defendant argues that defense counsel was ineffective for failing to call Zamora and Reed-Davenport to testify in favor of defendant's self-defense theory.  At the *Ginther* hearing, Reed-Davenport testified that he was at the block party on the day of the shooting.  He heard Monte arguing with Owens and heard Owens tell Monte that Monte was drunk and "tripping."  Reed-Davenport also heard Monte say that he would put money on somebody's head, meaning that he would hire a hitman to kill someone.  Monte was slurring his words, unable to stand up straight, and smelled of alcohol.  Ashanti came out of a nearby house with a gun in her hand and gave it to Monte, who aimed and fired a shot.  Reed-Davenport was unable to tell at whom Monte was aiming the gun, and he left the area because of the shooting.  According to Reed-Davenport, he contacted defense counsel and told him what he had seen, but defense counsel never followed up with him.  He also did not speak to the police because he had an outstanding warrant for his arrest at the time of the shooting.  Reed-Davenport acknowledged that he communicated regularly with defendant and that he was incarcerated with defendant at the Saginaw County Jail while defendant's charges were pending.

Zamora testified that he was also present during the shooting.  He witnessed Monte involved in an argument, during which Monte was acting "very aggressive" and saying that he would put money on someone's head.  According to Zamora, Ashanti handed Monte a gun, and Monte waved the gun around and was the first to shoot.  Zamora dropped to the ground after Monte fired the gun, and he then saw Owens and several others (but not defendant) shooting.  Zamora told the police in a recorded interview about the incident that defendant did not have a gun because he did not feel a gun when he hugged defendant that day.  When the shooting stopped, Zamora got into a car with his cousins, and they drove away.  Zamora also regularly communicated with defendant. He and defendant were originally codefendants, and they regularly communicated with each other while in jail after the shooting.  But after their preliminary examination, Zamora pleaded no-contest to a charge of being an accessory after the fact.  Zamora testified that he did not know what defendant meant when he "told people he wasn't going to take a lick for [Zamora]" and when defendant had said that Zamora "started something" and defendant "got fried for it."

Defendant testified that he had expected to have a joint trial with Zamora and that Zamora had told him that he would testify in defendant's favor. Defendant "thought [Zamora] was going to be a man of his word and stick with it," and he "really thought [Zamora] was on some BS" when he learned that they would not be tried together. Despite those statements, defendant testified that he was never upset with Zamora, explaining that "I still call him my brother to this day." He believed that it was "the system" that caused Zamora to forgo a trial, and that it was not defense counsel's fault. Defendant testified, consistently with the other two witnesses, that Monte was drunk and aggressive, that Ashanti handed Monte a gun, and that Monte shot first. He explained that he hid behind a car and pointed his own gun at Monte but did not shoot. He acknowledged that his statement conflicted with Zamora's testimony that defendant did not have a gun.

After hearing testimony from these witnesses and defense counsel, the trial court denied defendant's motion for a new trial. In a written order, it found that Zamora and Reed-Davenport were not credible witnesses and that their testimony would not have supported the defense strongly enough to affect the outcome of the trial. Defense counsel's failure to investigate or call them as witnesses, therefore, did not constitute ineffective assistance of counsel.

Considering the testimony from the *Ginther* hearing, we conclude that defense counsel was not ineffective for failing to investigate and call Reed-Davenport or Zamora as defense witnesses because their testimony would not have affected the jury's verdict. See *Yeager*, 511 Mich at 488. Most of the testimony elicited from these witnesses was cumulative to evidence presented at trial. Reed-Davenport and Zamora testified that Monte was intoxicated, but the jury heard that a toxicology analysis from Monte's autopsy was positive for ethanol, cannabinoids, oxycodone, and oxymorphone, and that Monte's blood alcohol content was 0.113 grams per 100 milliliters. Trial witnesses also testified that Monte had been in an argument involving Owens before the shooting occurred and that Monte had threatened Owens. The jury also heard from one witness that Monte fired shots and that Ashanti owned a firearm that was not in her house after the shooting and that would have fired bullets consistent with shell casings found at the scene. From that information, the jury could infer that Monte had used Ashanti's gun. Given that the jury convicted defendant despite that evidence, it is unlikely that cumulative testimony from Reed-Davenport and Zamora would have affected the outcome of the trial.

The only substantively new information from Reed-Davenport and Zamora's testimony was the specific wording of Monte's threat and the statement that Monte had fired first. But as the trial court correctly noted, Monte's drunken rant about hiring a hitman would actually undermine a self-defense theory because the threat was less imminent and believable than MW's testimony at trial that Owens told her that Monte said that he was going to kill them. See MCL 780.972(1)(a) (requiring the individual claiming self-defense to "honestly and *reasonably* believe[] that the use of deadly force is necessary to prevent the *imminent* death of or *imminent* great bodily harm to himself for herself or to another individual.") (emphasis added).

Although the testimony that Monte was the first to shoot would have supported a self-defense theory, the trial court specifically found that Reed-Davenport and Zamora were not credible, and that finding was not clearly erroneous. There were several inconsistencies in Reed-Davenport's testimony, and defense counsel testified that he could not recall ever speaking to him and that he likely would have remembered such contact because unsolicited communications from witnesses are unusual. Both witnesses had communicated with defendant in jail before his trial,

-4-

raising the suspicion that they had colluded to present certain testimony. Although Zamora and defendant both denied that they had an agreement about the content of Zamora's testimony, one of defendant's statements ("I'm pissed at [Zamora] because he did a separate trial, basically I took a lick for him and he didn't testify his statement from me that we agree about"), strongly suggests that there was an agreement. And because Zamora had pleaded no-contest to being an accessory after the fact, Zamora would have had a personal motive to frame Monte as the initial aggressor to avoid civil liability in connection with the incident. See *Lichon v American Universal Ins Co*, 435 Mich 408, 417; 459 NW2d 288 (1990) ("The primary purpose of a plea of nolo contendere is to avoid potential future repercussions which would be caused by the admission of liability, particularly the repercussions in potential future civil litigation."). Zamora's claim that defendant was unarmed was also contradicted by a photograph admitted at trial that showed defendant at the party aiming a large handgun in an offensive rather than defensive posture, indicating active participation in the shooting.

The evidence presented at the *Ginther* hearing, when considered within the context of the evidence presented at trial, likely would not have changed the jury's verdict. Because ineffective assistance of counsel requires showing that defense counsel's deficiencies created a reasonable probability that the outcome of the trial would have been different, *Yeager*, 511 Mich at 488, defendant has not shown that the trial court abused its discretion when it denied his motion for a new trial.

## C. CONCESSION OF GUILT

Defendant next argues that defense counsel was ineffective because he conceded that defendant was guilty without defendant's consent, which violated defendant's right to maintain his innocence. We disagree.

Decisions regarding "what evidence to highlight during closing argument" is presumed to be a matter of trial strategy. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). During his closing argument, defense counsel made the following statement:

> You know, I was thinking about going through the jury instructions that day. Well, craziest things are out there. Let the jury know that if they think it's self-defense, it can be self-defense. *There's no evidence. We didn't present any evidence. We didn't make that claim that it was self-defense.* I just ask the Court, well, why don't you read that because I don't know what a juror would be thinking about that. [Emphasis added.]

Defendant argues that this statement effectively conceded his guilt. But when considered in context, it is clear that defense counsel did not concede defendant's guilt or abandon the self-defense theory.

When defense counsel stated that "there's no evidence" and that the defense "didn't make that claim that it was self-defense," he appears to have been addressing the fact that only the

-5-

prosecution presented evidence.[4]  Defense counsel followed the statement by arguing that Monte was heavily intoxicated, "acting like a high, drunk guy," and disrupting the party.  He further addressed the fact that Ashanti's gun that was never found and suggested that the gun was hidden "[b]ecause they thought Monte was the aggressor and they didn't want the police to get that gun." Defense counsel also questioned why Monte did not drop to the ground to avoid being shot if he was not the aggressor, and he highlighted MW's testimony that someone told her that Monte had threatened to kill them.  Defense counsel clearly did not abandon the self-defense theory.  And there was a reasonable trial strategy that would justify his statement that the defense "didn't make the claim that it was self defense," despite having approved the trial court's jury instructions, which included an instruction on self-defense.  To affirmatively state that defendant acted in self-defense, defense counsel would have had to concede that defendant shot Monte.  But that concession would have been inconsistent with the alternative defense theory that the prosecutor presented insufficient evidence of the crime.

In addition to arguing self-defense, defense counsel also highlighted potential flaws in the investigation of this case, noting that it was unclear when Monte was shot and where in the neighborhood he was at that time.  He also emphasized that there were multiple people firing shots, which cast doubt on whether defendant or someone else had shot Monte, that the prosecutor had not presented sufficient evidence to prove that defendant had aided and abetted the people who actually shot Monte, and that many of the witnesses were possibly biased because they were related to Monte.  Defense counsel's final statement in closing was "I'll tell you one thing, they haven't proven that [defendant] intended to kill Monte Wilson."  This clearly was not a concession of guilt. Rather, the closing argument reflects defense counsel's sound trial strategy of presenting the alternative defense theories of insufficient evidence and self-defense.  Because defense counsel's performance was not deficient in that regard, defendant has failed to show that he was denied the effective assistance of counsel on that basis.  See *Yeager*, 511 Mich at 488.

## D.  EXPERT TESTIMONY

Finally, defendant argues that defense counsel was ineffective for failing to object to Dr. David Moons's expert testimony about Monte's manner of death.  Again, we disagree.

"[E]xpert testimony must be limited to opinions falling within the scope of the witness's knowledge, skill, experience, training, or education."  *People v Unger*, 278 Mich App 210, 251; 749 NW2d 272 (2008).  A forensic pathologist is "qualified to opine with respect to the manner of a decedent's death," not just the decedent's cause of death.  *Id*.

---

[4] The trial court subsequently instructed the jury that defendant is presumed innocent and "is not required to prove his innocence or to do anything."  Defense counsel approved that instruction before making his closing argument, so he knew that the jury would not misconstrue his decision to highlight that the defense did not present any evidence outside of cross-examination as a concession or indication of guilt.  See *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) ("Jurors are presumed to follow their instructions, and jury instructions are presumed to cure most errors.") (quotation marks and citation omitted).

The trial court qualified Dr. Moon as an expert in forensic pathology. He then testified that he had performed Monte's autopsy, which revealed that a bullet had passed through his right arm and lodged into his chest cavity. He concluded that Monte's cause of death was a gunshot wound. He suggested that the manner of death be deemed a homicide because the autopsy revealed nothing "consistent with a self-inflicted gunshot wound" and because he had received a summary of the incident leading to Monte's death.[5] As a forensic pathologist, Dr. Moons was qualified to give this testimony. See *Unger*, 278 Mich App at 251. Defendant argues that Dr. Moons's opinion on the manner of death was inadmissible because it was "based primarily on nonmedical evidence" and should have been left for the jury to determine on its own. See *People v Kowalski*, 492 Mich 106, 122; 821 NWd 14 (2012) ("[E]ven proposed expert testimony that is offered by a qualified expert and based on reliable scientific data and methods may be properly excluded if it . . . is offered for a proposition that does not require the aid of expert interpretation."). But defendant overlooks the value of Dr. Moons's expertise. Dr. Moons used "homicide" as a term of art—he described it as one of the "five categories" that forensic pathologists use to describe the manner of death (the others being natural death, accidental death, suicide, and "indeterminate"), and it only means that "the death is due to the actions of another individual." This differs from the layperson's understanding of the word "homicide" and inherently excludes other possible explanations for Monte's death. Dr. Moons's expert opinion about the manner of death therefore aided the jury in understanding the circumstances of Monte's death beyond what they might have gleaned without his testimony.

Because Dr. Moons's testimony about Monte's manner of death was admissible, any objection to that testimony would have been unsuccessful. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Accordingly, defense counsel was not ineffective for failing to object to Dr. Moons's testimony.

Affirmed.

/s/ Mark T. Boonstra
/s/ Adrienne N. Young
/s/ Daniel S. Korobkin

---

[5] Dr. Moons also clarified that his conclusions were merely suggestions because "it's the medical examiner who determines the final cause and manner of death in a county."